IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RANDELL LEE DUNCAN                                      PLAINTIFF

    v.                              CIVIL NO. 16-5357

NANCY A. BERRYHILL,[1] Commissioner
Social Security Administration                          DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Randell L. Duncan, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current application for DIB on May 9, 2013, alleging an inability to work since October 1, 2011, due to macular degeneration, blindness, arthritis, seizures, diabetes, hypertension, obesity, anxiety, depression, and carpal tunnel syndrome.  (Tr. 136, 411-414, 439, 478, 481, 490).  For DIB purposes, Plaintiff maintained insured status through March 31, 2014. (Tr. 402-403).  An administrative hearing was held on April 23, 2015, at which Plaintiff appeared with counsel and testified. (Tr. 125-161).

---

[1] Nancy A. Berryhill, has been appointed to serve as acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule  25(d)(1) of the Federal Rules of Civil Procedure.

By written decision dated November 2, 2015, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe.  (Tr. 91).  Specifically, the ALJ found Plaintiff had the following severe impairments:  lumbar degenerative joint disease (DJD), bilateral macular degeneration, diabetes mellitus, hypertension, obesity, panic disorder with agoraphobia, depressive disorder, not otherwise specified (NOS), and personality disorder. (Tr. 91).  However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Doc. 13, p. 19).  The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform medium work as defined in 20 CFR 404.1567(c) except he had to avoid work where excellent depth perception is required.  In addition, he was limited to work with simple, routine and repetitive tasks, involving only simple, work-related decisions, with few, if any, workplace changes.  He could have no more than incidental contact with coworkers, supervisors, and the general public.

(Tr. 94-95).  With the help of a vocational expert, the ALJ determined Plaintiff could perform work as a hand packer, industrial cleaner, and machine packager.  (Tr. 101).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which initially denied that request on September 27, 2016. (Tr. 9-13).  Next, the Appeals Council on October 18, 2016, set aside their September 27, 2016 denial in order to consider additional information. (Tr. 1-8).  After considering the additional information, the Appeals Council found no reason under the rules to review the hearing decision because the new information provided was about a later time subsequent to the date last insured. (Tr. 1-8).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 11, 12).

2

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Evidence Presented:

At the time of the administrative hearing held on April 23, 2015, Plaintiff was fifty-three years of age.  (Tr. 129).  Plaintiff had a limited education. (Tr. 100, 1122, 1256).  The ALJ determined that Plaintiff's work experience did not constitute past relevant work. (Tr. 100).

A review of the pertinent medical evidence reflects the following.  On December 22, 2008, Plaintiff presented himself to the emergency department of Mercy Hospital, and he complained of ongoing right hip pain for two weeks. (Tr. 541-571, 890-915).  Right hip and pelvis X-Rays showed no acute osseous processes. (Tr. 543-544).  Upon exam, the right lateral hip exhibited tenderness, a decreased active range of motion due to pain was exhibited, and he walked with a limp. (Tr. 557).  Plaintiff was diagnosed with right hip pain. (Tr. 557).

On January 8, 2009, Plaintiff went to the emergency department of Mercy Hospital, and he reported left wrist and bilateral hip pain. (Tr. 572-602, 916-946).  Dr. Jeff Audibert, M.D. noted that Plaintiff was referred to Dr. Michael Griffey, M.D. an orthopedic surgeon, during the December 22, 2008 visit, but he had not been seen nor made an appointment. (Tr. 573).  Plaintiff was diagnosed with right lumbar radiculopathy and carpal tunnel syndrome (CTS) with the left worse than the right. (Tr. 575).

On March 11, 2011, Plaintiff reported increased stress and anxiety to Ms. Stacey Enlow, A.P.N.  (Tr. 757-758, 829-830).  Plaintiff was diagnosed with anxiety and restarted on Xanax. (Tr. 757-758).

On May 25, 2011, Plaintiff returned to Ms. Enlow and reported increased anxiety due to his father's passing. (Tr. 755-756, 827-828).  Ms. Enlow refilled Xanax. (Tr. 755).

The medical evidence continues after the alleged onset date of October 1, 2011.  On October 24, 2011, Plaintiff reported to Ms. Enlow that he had hand and joint pain along with fatigue. (Tr. 752-754, 824-826).  Plaintiff reported the onset of his symptoms was due to painting Wal-Mart stores, and his hand and feet hurt. (Tr. 754).  Ms. Enlow diagnosed him with anxiety, joint pain, fatigue, and diabetes, and she conducted a prostate-specific antigen (PSA) screening. (Tr. 752, 761-765, 834-838).   Ms. Enlow noted she would have a conversation with Plaintiff about whether he wanted to start Metformin or try diet changes to control the diabetes. (Tr. 753).  Plaintiff was prescribed Meloxicam and Xanax. (Tr. 752).

On November 21, 2011, Plaintiff presented himself to WW Hastings Primary Care (Hastings) and reported a fall two months prior that resulted in a left shoulder injury with pain. (Tr. 1212-1219).  Plaintiff reported Naproxen and Percocet helped the pain. (Tr. 1215).  An X-ray of the left shoulder showed no acute defect and a healed clavicle fracture. (Tr. 1216).  Plaintiff received a flu vaccine, tetanus shot, methylprednisolone injection, and dexamethasone injection. (Tr. 1216).

On December 14, 2011, Plaintiff presented himself to Hastings and complained of left shoulder pain with overhead activity or sleeping on the affected side. (Tr. 1208-1211).  Plaintiff also reported hip pain. (Tr. 1208).  Plaintiff was diagnosed with left shoulder pain, and he was prescribed Meloxicam along with a physical therapy referral. (Tr. 1209).

On September 19, 2012, Plaintiff presented himself to the emergency department of Northwest Medical Center and complained of an anxiety attack. (Tr. 779-783).  Dr. Shawn Brown, M.D. diagnosed Plaintiff with acute anxiety, and he was instructed to call

Ozark Guidance Center (OGC) for mental health treatment, return to the emergency department if he had any suicidal thoughts, and prescribed Xanax. (Tr. 780).

On September 20, 2012, Plaintiff presented himself to Ms. Nancy Ghormley, L.P.C. at the OGC for mental health services. (Tr. 1090-1096). Plaintiff was taking Xanax 1 mg, 3-4 times daily, and he had taken Klonopin, Wellbutrin and Prozac in the past. (Tr. 1092, 1094). He previously received rehabilitation services at Decision Point in 1989 for methamphetamine. (Tr. 1093). He reported no delusions, hallucinations, or risk of harm to self or others. (Tr. 1093-1094). His mood was anxious, affect was constricted, and his intelligence was average. (Tr. 1094). His Daily Living Activities (DLA-20) score was 95. (Tr. 1094-1095). Plaintiff's Axis I diagnosis was anxiety disorder NOS and past drug dependency; Axis II diagnosis was diagnosis deferred; Axis III diagnosis none known; Axis IV diagnosis was access to healthcare, no insurance, occupational, economic, and legal issues; and his GAF score was 48. (Tr. 1096). Ms. Ghormley recommended individual therapy/counseling, medication management, and psychiatric diagnostic assessment. (Tr. 1096).

On October 29, 2012, Plaintiff presented himself to Dr. Suzanne Lakamp, O.D. at NSU Oklahoma College of Optometry (NSU), and complained of film over his left eye that was very blurry. (Tr. 813, 1252-1253, 1281-1282, 1299-1300). Plaintiff was positive for smoking, and his past medical history included borderline diabetes and hypertension. (Tr. 813). Plaintiff's visual acuity was 20/25-2 on the right and 20/200-1 on the left. (Tr. 813). Dr. Lakamp diagnosed him with macular degeneration, dry, right; macular degeneration, wet, left; and retinal hemorrhage, left. (Tr. 813). Plaintiff was referred to a retina specialist. (Tr. 813).

5

On October 29, 2012, Plaintiff presented himself to Hastings seeking a behavioral health referral, and he was in need of medication refills. (Tr. 1205-1207).

On November 5, 2012, Plaintiff reported being under a lot of stress lately, and Dr. Kenneth Poemoceah, M.D. restarted Xanax for anxiety. (Tr. 750-751, 822-823). Dr. Poemoceah noted that Plaintiff had borderline diabetes, but he was not taking any medications for it. (Tr. 750, 759-760, 832-833).

On November 8, 2012, Ms. Ghormley at Ozark Guidance provided a Master Treatment Plan to treat Plaintiff's excessive anxiety/mood instability. (Tr. 1097-1099). Plaintiff reported his longest time to work at a company was three years. (Tr. 1098). The treatment plan target date was February 6, 2013. (Tr. 1098).

On December 3, 2012, Plaintiff returned to NSU and reported that he could not see well out of his left eye. (Tr. 814, 1250-1251, 1298). Dr. Jamie Khan, D.O. noted that his left eye appeared stable when compared to photos from the October 29, 2012 office visit. (Tr. 814). Dr. Kahn wrote that Plaintiff had a blood hemorrhage in the left eye resulting in vision loss. (Tr. 814). Dr. Kahn discussed with Plaintiff that the only treatment for his condition besides monitoring was to have an Avastin or Kenalog injection. (Tr. 1251). Dr. Kahn found Plaintiff should not work due to a blood hemorrhage in the left eye resulting in loss of vision. (Tr. 1280). Dr. Kahn found Plaintiff should not drive or perform heavy lifting and should limit stress. (Tr. 1280).

On December 10, 2012, Plaintiff reported to Dr. Poemoceah that he was doing okay on current medications. (Tr. 748-749, 820-821). Plaintiff reported his pain was 0/10. (Tr. 749). Dr. Poemoceah noted that Plaintiff's blood sugar results looked really good, and Plaintiff was diagnosed with anxiety and macular degeneration. (Tr. 748).

6

On January 24, 2013, Plaintiff presented himself to Dr. Lakamp at NSU. (Tr. 1240-1249).  Plaintiff was diagnosed with exudative senile macular degeneration on the left with large area of intraretinal swelling of the posterior pole and intraretinal hemorrhage in central macula. (Tr. 1244).  Plaintiff was also diagnosed with senile macular degeneration on the right. (Tr. 1244).  Dr. Lakamp noted that an appointment was made months prior with Northwest Eye, but Plaintiff did not want to pay for treatment and did not follow through. (Tr. 1244).  Plaintiff was sent to obtain contract health approval to see Dr. Lars Freisburg, M.D. for retinal evaluation and injection. (Tr. 1244).  Plaintiff was requested on multiple occasions to provide proof of residence. (Tr. 1244).  Dr. Lakamp noted that during the visit Plaintiff requested documentation for court stating that he was unable to work. (Tr. 1244).  Dr. Lakamp found that Plaintiff was fully capable of working, and if the court needed documentation, Plaintiff would have to supply the documentation at a later visit from a full time faculty member. (Tr. 1244).

On February 6, 2013, Plaintiff reported to Dr. Poemoceah. that he was doing well on current medicines, had no ill-effects, and wanted to continue current medications. (Tr. 746-747, 818-819).  Plaintiff reported his pain was 0/10. (Tr. 747).  Dr. Poemoceah diagnosed him with anxiety and refilled his Xanax. (Tr. 746-747).

On February 18, 2013, Plaintiff presented himself to Hastings and requested a refill of Oxycodone for eye pain and medication for anxiety symptoms. (Tr. 1187-1195).  Plaintiff was prescribed Buspirone for anxiety. (Tr. 1188).  Right carpal tunnel release surgical history was noted. (Tr. 1191).  Plaintiff reported smoking half a pack of cigarettes daily. (Tr. 1192).

On February 18, 2013, Plaintiff presented himself to Dr. Richard Castillo, D.O. at NSU. (Tr. 1234-1238).  Plaintiff's visual acuity at the time was 20/25+1 on the right and LP at five feet on the left. (Tr. 1235).  Plaintiff reported his central field was still restricted, but the left

field had improved from the previous visit. (Tr. 1236).  Dr. Castillo diagnosed Plaintiff with exudative senile macular degeneration on the left, a large area of intraretinal swelling of the posterior pole in the left, resolving intraretinal hemorrhage in the central macular, and senile macular degeneration on the right. (Tr. 1238).  Plaintiff was encouraged to decrease smoking and monitor changes with Amsler grid. (Tr. 1238).  Plaintiff was referred to a specialist for macular optical coherence tomography (OCT) of both eyes. (Tr. 1238).  Plaintiff was to provide contract health with a new Oklahoma address. (Tr. 1238).  Dr. Castillo noted that an Avastin injection with Dr. Freisburg was to be set once Plaintiff provided the address. (Tr. 1234).

From April 21, 2013 to April 26, 2013, Plaintiff presented himself to the emergency department at Northwest Medical Center, and he was admitted for inpatient treatment due to suicidal ideation after being released from incarceration due to not paying child support. (Tr. 785-807, 840-848, 1285-1295).  Dr. Jon Rubenow, D.O. diagnosed him at Axis I with mood disorder NOS and alcohol dependence in partial remission. (Tr. 785). Dr. Rubenow noted Plaintiff participated in one-on-one counseling and appeared motivated for change, and the Xanax taken prior to admission was discontinued. (Tr. 785).  His admission global assessment of functioning (GAF) score was 25 and upon discharge it was 40. (Tr. 786).  Plaintiff was instructed to obtain follow up care at Ozark Guidance Center, and he was prescribed Lithium Carbonate and Trazodone. (Tr. 786).

On May 9, 2013, Plaintiff presented himself to Ms. Lindsey Myers, L.C.S.W. at OGC for follow up care after his inpatient treatment. (Tr. 1100-1105).  Plaintiff reported that he felt better on Lithium, but did not like the side effects. (Tr. 1100).  Plaintiff stated that without medication he was very moody and had racing thoughts. (Tr. 1100).  Plaintiff also reported

abusing alcohol for 35 years, and he was currently sober since April 15, 2013. (Tr. 1100).  His mood was depressed and his affect was full. (Tr. 1101).  Plaintiff did not exhibit a current risk of harm to self or others. (Tr. 1101).  Plaintiff was diagnosed with mood disorder, unspecified episodic; rule out post traumatic stress disorder; anxiety disorder NOS; cluster B traits; other medical condition; problems with primary support, occupational problems, economic problems, and problems related to legal system or crime; and her GAF score is 50. (Tr. 1102).  Ms. Myers recommended individual therapy, group therapy, and psychiatric evaluation. (Tr. 1104).

On May 31, 2013, Plaintiff saw Dr. Barry Cole, M.D. for psychiatric evaluation. (Tr. 1106-1111).  Plaintiff reported he stopped taking Lithium due to side effects, and Trazodone gave him leg cramps and headaches. (Tr. 1106).  Plaintiff was also prescribed Xanax by Dr. Poemoceah, but was not taking the maximum amount allowed. (Tr. 1106).  He stated he still has anxiety and does not sleep well. (Tr. 1106).  Plaintiff reported that he drank 30 beers daily in the past, and his last drink was in February 2013 prior to his incarceration. (Tr. 1106).  Dr. Cole diagnosed Plaintiff with cyclothymic disorder, generalized anxiety disorder, and alcohol dependence in sustained full remission, with a GAF score of 50. (Tr. 1108-1109).  Plaintiff was instructed to stop taking Xanax, continue Trazodone, and start Cymbalta for pain, depression, and anxiety, but watch for hypomania. (Tr. 1109).  Dr. Cole recommended that Plaintiff attend individual and group therapy weekly. (Tr. 1109).

On June 7, 2013, Plaintiff presented himself to Hastings and complained of numbness in the third and fourth digits of the right hand. (Tr. 1183-1186).  He also reported he discontinued taking Lithium and needed Buspirone refilled. (Tr. 1183).  Dr. Matthew Clay

9

Headrick, D.O. referred Plaintiff for an electromyogram and nerve conduction study (EMG/NCV) due to possible ulnar nerve entrapment. (Tr. 1184).

On June 7, 2013, Plaintiff reported to Dr. Patrick Stark, O.D. at NSU that he wanted to make sure his macular degeneration had not progressed. (Tr. 1228-1232, 1296-1297). Plaintiff complained that vision at a distance has a blur that comes and goes and near vision was not as good as before. (Tr. 1228). Photos and OCT showed dry age-related macular degeneration on the right appeared stable over past few months, and left had exudative age-related macular degeneration throughout macula/posterior pole that appeared somewhat progressed from last photos on February 2013. (Tr. 1231). Dr. Stark diagnosed him with exudative senile macular degeneration on the left and right. (Tr. 1232). Plaintiff was informed that he needed to provide proof of an Oklahoma address to be taken into contract health so he would be able to see a retinal specialist as soon as possible. (Tr. 1232). Plaintiff was also educated about smoking cessation and Amsler grid use. (Tr. 1232). Dr. Stark found that Plaintiff would be able to return to his painting job, and Dr. Stark advised Plaintiff that he could drive a personal vehicle and lift objects without progression of age-related macular degeneration based on the findings at the office visit. (Tr. 1232).

On July 22, 2013, Plaintiff presented himself to Dr. Van Pho, M.D. at Sam Hider Community Clinic (Hider) and requested Xanax. (Tr. 1165-1168). Plaintiff was prescribed Clonazepam. (Tr. 1166). Plaintiff complained of pain in his left hip that radiated to the left leg, and a left hip X-ray revealed mild degenerative changes of the lower lumbar spine. (Tr. 1177).

On August 5, 2013, Plaintiff presented himself to Dr. Pho at Hider for a follow up visit. (Tr. 1160-1162). Plaintiff had normal lab results except for triglyceride level. (Tr. 1160).

10

Plaintiff's blood pressure was controlled at 123/78. (Tr. 1160). Dr. Pho prescribed Divalproex and Atorvastatin. (Tr. 1161).

On August 8, 2013, Plaintiff was admitted to 12 & 12 for residential substance abuse treatment. (Tr. 1117-1150). Plaintiff was diagnosed with alcohol, cannabis, sedative, and nicotine dependence, as well as amphetamine dependence in remission. (Tr. 1124). His GAF score was 50. (Tr. 1124). Plaintiff remained in treatment for 45 days and completed all treatment plan objectives. (Tr. 1125).

On September 17, 2013, Ms. Myers of OGC discharged Plaintiff because he did not return to treatment. (Tr. 1112-1113). Plaintiff was seen once by a therapist, nurse, and psychiatrist, but did not follow through with follow up appointments. (Tr. 1113).

On October 8, 2013, non-examining consultant, Dr. Cheryl Woodson-Johnson, Psy.D. noted at the initial level that a current mental status exam was needed to make a mental RFC. (Tr. 315). Plaintiff could not be located, and therefore there was insufficient evidence to make a determination. (Tr. 315).

On October 9, 2013, non-examining consultant, Dr. Charles Friedman, M.D., found there was insufficient evidence to rate Plaintiff's physical RFC at the initial level. (Tr. 315).

On November 18, 2013, Plaintiff presented himself to Dr. Pho at Hider for medication refills. (Tr. 1154-1159). His medications included Atorvastatin, Clonazepam, Ibuprofen, Lisinopril, and Lithium. (Tr. 1154). Dr. Pho noted that Plaintiff was smoking daily. (Tr. 1154). Plaintiff was diagnosed with anxiety; hypertension; pain in joint, pelvic region, and thigh; mixed hyperlipidemia; and cannabis dependence. (Tr. 1155).

On February 24, 2014, Plaintiff presented himself to Dr. Castillo at NSU and complained of blurred vision, decreased vision in both eyes, eye pain, and headaches. (Tr.

11

1222-1226).  He stated that glasses were not helping, especially bifocals. (Tr. 1222).  Plaintiff reported that he no longer drove due to his vision. (Tr. 1222).  When watching television or reading, Plaintiff stated one side appeared further away and the other closer. (Tr. 1222).  Photos and OCT revealed dry, age-related macular degeneration on the right that appeared stable over past few months. (Tr. 1225).  On the left, the OCT showed exudative age-related macular degeneration throughout the macula/posterior pole, appeared it progressed from last photos in June 2013, with fibrosis and scar tissue. (Tr. 1225).  Elevation and edema were noted within both arcades. (Tr. 1225).

Dr. Castillo diagnosed Plaintiff with exudative senile macular degeneration on the left, a large area of intraretinal swelling of the posterior pole in the left, resolving intraretinal hemorrhage in the central macular, and senile macular degeneration on the right.  (Tr. 1226). Plaintiff reported he now had an Oklahoma address. (Tr. 1222).  Dr. Castillo scheduled a visit with Dr. Freisburg for the Plaintiff, smoking cessation was discussed, and he was advised to continue using Ocuvite vitamins. (Tr. 1226).

On March 5, 2014, Plaintiff presented himself to Dr. Freisberg of Retina Vitreous Affiliates.  (Tr. 1179, 1220-1221).  Dr. Freisberg noted Plaintiff's visual acuity was 20/40 in the right eye, and pin-holing to 20/25, and hand motion in his left eye. (Tr. 1179, 1220). Plaintiff's anterior segments were quiescent with moderate cataract changes. (Tr. 1220).  The left eye showed disciform scar about three by five-disc diameters in size, significant exudation at its margins, but no active hemorrhaging was seen at the time. (Tr. 1179, 1220).

Dr. Freisberg diagnosed Plaintiff with exudative age-related macular degeneration, left eye; non-exudative age-related macular degeneration, right eye; moderate cataract changes, both eyes; and hypertensive retinopathy. (Tr. 1220).  Dr. Freisberg determined that treatment

12

benefits for Plaintiff's left eye were quite limited, and the main goal was to provide treatment to minimize the risk of worsening. (Tr. 1220). Dr. Freisberg noted that at the current level, he did not see much immediately happening, especially the fluorescein showed no significant leakage in the late frames. (Tr. 1179). Dr. Freisberg opined that Plaintiff's right eye in contrast with a small cluster of drusen in the temporal fovea might be the reason Plaintiff sees slight waviness in the far periphery. (Tr. 1221). Plaintiff was encouraged to monitor his vision with an Amsler grid, and Dr. Freisberg recommended smoking cessation, routine monitoring, and AREDS-based vitamins. (Tr. 1221).

On March 12, 2014, Dr. Terry L. Efird, Ph.D. conducted a consultative mental diagnostic evaluation. (Tr. 1255-1259). Plaintiff reported multiple mood swings daily, anxiety/nervousness, mood issues, lack of sleep, and decreased interest in activities. (Tr. 1255). Plaintiff reported he was prescribed Lithium, it was somewhat beneficial, medications were taken as prescribed, and he experienced a side effect of tremors. (Tr. 1255-1256). Plaintiff endorsed the ability to perform basic self-care tasks, but the ability to perform household chores was impaired by hand problems. (Tr. 1256). Plaintiff had not worked consistently since 2011, when he painted Wal-Mart stores, and he reported relationship problems with co-workers and supervisors along with terminations from employment. (Tr. 1256). Plaintiff reported that he had spent time in jail off and on for a number of years for nonpayment of child support. (Tr. 1257). He also reported his driver's license was suspended about 11 months ago by child support enforcement. (Tr. 1258). Plaintiff stated he had not consumed alcohol in nine months, and he had a prior 35-year history of alcohol dependence. (Tr. 1256).

Dr. Efird noted Plaintiff's mood was generally dysphoric, affect somewhat restricted in range, and suicidal ideations last occurred two weeks ago. (Tr. 1256-1257). Plaintiff had

13

normal thought process and cognition, and his fund of general information suggested an average range of intellectual functioning. (Tr. 1256-1257). Dr. Efird diagnosed Plaintiff with panic disorder, with agoraphobia; depressive disorder NOS; alcohol dependence in partial remission; personality disorder NOS, antisocial traits; and GAF score of 59-69. (Tr. 1258).

Dr. Efird noted Plaintiff could shop independently, his handling of personal finances was impaired because he spends impulsively, and Plaintiff reported his ability to perform activities of daily living were impaired by hand problems. (Tr. 1258). Social interactions included the following: interacted with family on special occasions, talked to mother by telephone twice a week, and he visited with his older two children weekly and his girlfriend's family regularly. Dr. Efird assessed that Plaintiff communicated and interacted in a reasonably socially adequate manner, and he communicated in a reasonably intelligible and effective manner. (Tr. 1258). Plaintiff had the capacity to perform basic cognitive tasks required for basic work-like activities. (Tr. 1258). Plaintiff also appeared able to track and respond adequately for the purposes of the evaluation, and he generally completed most tasks during the evaluation. (Tr. 1258). No remarkable problems with persistence were noted, and Plaintiff appeared to have the mental capacity to persist with tasks if desired. (Tr. 1258). Plaintiff completed most tasks within an adequate time frame, and he appeared capable of performing basic work-like tasks within a reasonable time frame. (Tr. 1258). Dr. Efird noted malingering was not found, and Plaintiff was able to manage funds without assistance. (Tr. 1258-1259).

The Plaintiff's date last insured was March 31, 2014. On April 2, 2014, non-examining consultant, Dr. Kay Gale, M.D. completed a Psychiatric Review Technique at the reconsideration level. (Tr. 326-328). Dr. Gale cited Listings 12.04, affective disorders; 12.06, anxiety-related disorders; 12.08, personality disorders; and 12.09, substance addiction

14

disorders. (Tr. 327).  Dr. Gale assessed that Plaintiff had mild limitations with activities of daily living; mild limitations with social functioning; and moderate limitations maintaining concentration, persistence, or pace. (Tr. 327).  No episodes of decompensation were noted. (Tr. 327).

Dr. Gale also completed a Mental Residual Functional Capacity Assessment at the reconsideration level on April 2, 2014. (Tr. 331-333).  Dr. Gale assessed Plaintiff retained the ability to perform simple, routine, repetitive work in a setting with limited contact with others. (Tr. 333).  Plaintiff had no understanding and memory limitations. (Tr. 332).  Dr. Gale found Plaintiff had the following sustained concentration and persistence limitations:  ability to carry out detailed instructions was moderately limited; ability to maintain attention and concentration for extended periods was moderately limited; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited. (Tr. 332).

On April 3, 2014, non-examining consultant, Dr. Steve Strode, M.D., completed a Physical Residual Functional Capacity Assessment at the reconsideration level. (Tr. 329-331). Dr. Strode assessed that due to the medically determinable impairments of lumbar degenerative joint disease, bilateral macular degeneration, and type II diabetes mellitus, the medical evidence record supported a residual functional capacity of medium work. (Tr. 331). Dr. Strode found Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 329).  Dr. Strode assessed Plaintiff's push and/or pull abilities were unlimited other than shown for lift and/or carry. (Tr. 329).  Plaintiff had no

postural, manipulative, communicative, or environmental limitations. (Tr. 329-330).

Dr. Strode found Plaintiff's visual limitation was limited left eye depth perception and the other

visual categories were unlimited. (Tr. 330). Dr. Strode noted Plaintiff should avoid work tasks

in which excellent depth perception was required due to very poor left eye visual acuity. (Tr.

330).

On February 25, 2015, Plaintiff presented himself to Dr. William Webb, M.D.

complaining of syncope for the last three weeks. (Tr. 1262). Dr. Webb diagnosed Plaintiff

with anxiety and bipolar disorder. (Tr. 1262). Plaintiff was to continue Lithium, and Xanax

was added. (Tr. 1262). Dr. Webb noted that if the medications did not stop the seizure activity

and syncopal episodes, anti-seizure medicine would be added, an electroencephalogram (EEG)

would be ordered, and he would be referred to neurology. (Tr. 1262).

On March 25, 2015, Dr. Webb provided an abbreviated Physical Residual Functional

Capacity Assessment and Physical Medical Source Statement, both in a checklist format. (Tr.

1263-1266). Dr. Webb assessed the following regarding the Plaintiff: cannot sit for six hours

of an eight-hour workday; cannot sit/stand/walk in combination for eight hours of an eight-

hour workday; cannot perform part-time work activities of any nature for more than ten hours

in a 40-hour workweek; required four or more unscheduled work breaks in an eight-hour

workday due to physical restrictions; had significant limitations in the ability to reach/push/pull

bilaterally in the upper extremities; and had significant limitations in the ability to handle and

work with small objects with both hands. (Tr. 1263). Dr. Webb found he could frequently and

occasionally lift and/or carry ten pounds. (Tr. 1264). Plaintiff could stand and/or walk two

hours in an eight-hour workday and stand and/or walk continuously for one hour before taking

a break. (Tr. 1264). Dr. Webb assessed Plaintiff could sit for a total of two hours in an eight-

16

hour workday, and he could sit continuously for one hour before taking a break. (Tr. 1264). Plaintiff's push and/or pulling abilities were limited in the upper extremities. (Tr. 1264).  His work breaks or bathroom breaks would be five or more in an eight-hour workday. (Tr. 1264). Dr. Webb found Plaintiff would have to elevate his lower extremities twice a day. (Tr. 1264). Dr. Webb noted Plaintiff could not lay on his back. (Tr. 1265).

Dr. Webb assessed that Plaintiff could perform any work activities in a normal workday based upon the totality of the above symptoms in combination, including side effects of medication, for one hour in an eight-hour workday and continuously for half an hour. (Tr. 1265).  Dr. Webb assessed that Plaintiff could perform all the postural and manipulative limitations for less than two hours in an eight-hour workday. (Tr. 1265).  Dr. Webb found Plaintiff should avoid concentrated exposure to extreme heat, wetness, and humidity. (Tr. 1266).  Plaintiff should also avoid all exposure to extreme cold, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, including machinery or heights. (Tr. 1266).  The assessment period was from October 1, 2011 to March 25, 2015 and continued. (Tr. 1266). Dr. Webb noted affirmatively that his assessment was supported by objective findings and/or clinical observations or symptoms. (Tr. 1266).  Dr. Webb added a handwritten notation at the end of the assessment that Plaintiff had difficulty sitting up and down. (Tr. 1266).  However, Dr. Webb did not cite to objective findings, nor did he describe the principal clinical and laboratory findings and symptoms or allegations, including pain, from which the impairment-related capacities and limitations were concluded. (Tr. 1265-1266).

On March 25, 2015, Dr. Webb also provided a Mental Residual Functional Capacity Assessment in a checklist format. (Tr. 1267).  Dr. Webb assessed Plaintiff would have no useful ability to function on a sustained basis, meaning an eight-hour workday for five days a

week in a full workweek, for the following:  maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; work without deterioration or decompensation causing the individual to withdraw from the situation; and work without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors. (Tr. 1267).  The assessment period was from October 1, 2011 to March 25, 2015 and continued. (Tr. 1267).

On April 15, 2015, Plaintiff presented himself to Dr. Pho for lithium management. (Tr. 1269-1279).  Plaintiff reported "blacking out" a month prior with lightheadedness. (Tr. 1269). Plaintiff was diagnosed with rule out seizure and transient ischemic attack (TIA). (Tr. 1273). Dr. Pho ordered a CT scan and neurology consultation. (Tr. 1273).  Dr. Pho prescribed Clonazepam, Lithium, and Aspirin.  (Tr. 1273).

On June 22, 2015, Dr. Randel Saylor, M.D., an ophthalmologist, conducted a consultative examination. (Tr. 1304-1307).  Plaintiff's visual acuity was uncorrected 20/70 on the right eye and hand motions only on the left. (Tr. 1306).  Plaintiff's best corrected vision on the right was 20/60 with a refraction of a -0.50 +1.00 at 35 degrees. (Tr. 1306).  His near vision was 20/40 with a +2.25 add. (Tr. 1306).  Dr. Saylor found on the left eye, the refraction was

+0.25 +0.75 at 110 degrees. (Tr. 1306).  However, Dr. Saylor noted that it did not improve his vision and remained hand motions only on the left eye. (Tr. 1306).

Plaintiff's visual field on the right eye showed some subtle superior and inferior arcuate changes. (Tr. 1306).  On the left eye, there was marked visual field loss that was diffuse with a remaining inferotemporal field. (Tr. 1306).  Dr. Saylor noted the pupillary exam showed a 3+ relative afferent pupillary defect on the left. (Tr. 1306).  There was a 1+ nuclear sclerotic cataract in the lens of both eyes. (Tr. 1306).  The macula on the right showed 2+ retinal pigment epithelial changes and drusen, but appeared to be dry. (Tr. 1307).  On the left, there was massive subretinal fibrosis to the macula and posterior pole. (Tr. 1307).  The vessels showed some tortuosity on both eyes, but no evidence of vascular occlusions. (Tr. 1307).

Dr. Saylor noted Plaintiff's large macular scar in the left eye related to a previous subretinal hemorrhage. (Tr. 1307).  Dr. Saylor found there was no treatment for this and it was going to cause permanent visual loss for the left eye. (Tr. 1307).  Plaintiff also had signs of early dry macular degeneration on the right eye. (Tr. 1307).  Dr. Saylor opined it could progress and also convert to wet macular degeneration. (Tr. 1307).  Plaintiff would need access to vitreoretinal care and follow-up. (Tr. 1307).  Plaintiff also had early signs of cataracts in both eyes, but it was not significant at this stage, but could progress in the coming years. (Tr. 1307).  Dr. Saylor assessed Plaintiff had permanent visual loss on the left eye. (Tr. 1307).  Dr. Saylor also found he was at risk for possible progression of his macular problems. (Tr. 1307).

III.    **Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable

mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c (a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382(3)(C).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from

20

doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

## IV.  Discussion:

Plaintiff argues the following issues on appeal: 1) Whether the ALJ erred by finding macular degeneration as the only severe visual impairment; and 2) Whether the ALJ erred in his RFC determination. (Doc. 11).

### A.    Impairments:

An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 1520(a)(4)ii), 416.920(a)(4)(ii).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 C.F.R. § § 404.1521, 416.921.  The Supreme Court has adopted a "de minimis standard" with regard to the severity standard.   Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cri. 1989). "While '[s]everity is not an onerous requirement for the claimant to meet …it is also not a toothless standard.'" Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (quoting Kirby v. Astrue, 500 F.l3d 705, 708 (8th Cir. 2007).

Plaintiff argues the ALJ erred by finding macular degeneration as the only severe visual impairment. (Doc. 11).  Plaintiff also contends the ALJ erred by not finding Plaintiff's alleged left eye impairment the equivalent of blindness or a separate severe impairment for disability purposes. (Doc. 11).  In his decision, the ALJ set forth the fact that at step two, he must

21

determine whether Plaintiff had a medically determinable impairment that is "severe" or a combination of impairments that is "severe." (Tr. 90).  The ALJ properly determined Plaintiff's left eye impairment effects are associated with macular degeneration because the evidence showed both were considered together by medical providers throughout the record. (Tr. 331, 813-814, 1220, 1226, 1232, 1236-1238, 1244, 1304-1307).  There is also no evidence that the ALJ would have decided differently if the left eye impairment was found to be a separate medically determinable visual impairment, thus if an error existed, it would be considered harmless error. See Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008).

The ALJ also stated that at step three, he must determine whether the Plaintiff's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in the relevant listings. (Tr. 90).  The claimant has the burden of proving that his impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). "To meet a listing, an impairment must meet all of the listing's specified criteria." Id.

Plaintiff's argument that his left eye impairment equaled the severity level of statutory blindness is unfounded.  The Act defines statutory blindness as a "central visual acuity of 20/200 or less in the better eye with the use of a correcting lens." 20 CFR Part 404, Subpart P, Appendix 1.  Although Plaintiff argues his alleged left eye blindness constituted a step three determination, the definition clearly concerns the vision in the "better eye" which in Plaintiff's case is his right eye. The evidence supports the ALJ's finding that Plaintiff did not meet or medically equal a vision listing.  During the most recent vision examination in the record, for instance,  Dr. Saylor found that Plaintiff's visual acuity was uncorrected 20/70 on the right eye, and his best corrected vision on the right was 20/60 with a refraction of a -0.50 +1.00 at 35

degrees. (Tr. 1306).   As a result, Plaintiff's right eye vision did not constitute statutory blindness.

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's determination of severe impairments, and also that Plaintiff's impairments did not meet or medically equal a vision listing.

**B.    RFC Determination:**

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).   It is assessed using all relevant evidence in the record. Id.   This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.   Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).   Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."   Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).   "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC."   Id.

In determining that Plaintiff maintained the RFC to perform medium work with limitations, the ALJ considered Plaintiff's subjective complaints; his medical records; and the provided medical assessments. (Tr. 94-95).  The ALJ discussed the relevant objective medical evidence including Plaintiff's examinations with vision specialists in detail.

Plaintiff argues the ALJ should have included greater visual restrictions in the hypothetical presented to the vocational expert. (Doc. 11).  Plaintiff also disagrees with the

jobs the vocational expert found the hypothetical individual could perform and contends vision restrictions precluded the jobs. (Doc. 11).  After thoroughly reviewing the evidence of record, the Court finds the hypothetical the ALJ posed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. (Tr. 157-158); Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the VE's responses constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing work as a hand packer, industrial cleaner, and machine packager. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

Plaintiff also contends there was no substantial discussion of the GAF scores establishing greater mental restrictions. (Doc. 11).  The ALJ's decision to not give weight to Plaintiff's GAF scores in the record is supported by substantial evidence because "GAF scores have no direct correlation to the severity standard used by the Commissioner."  Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citing 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000)).  As a result, GAF scores are not given the same consideration as in the past.  "[A]n ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it." Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010).

Furthermore, the Court finds other evidence in support of the ALJ's mental RFC determination is more significant than the Plaintiff's GAF scores.  The ALJ assigned great weight to Dr. Efird's opinion because it was consistent and supported by the evidence of record as a whole. (Tr. 99).  Dr. Efird's assessment revealed Plaintiff had the capacity to work based on the wide-ranging mental capabilities assessed during the consultative examination. (Tr. 1255-1259).  Plaintiff reported throughout the record that he participated in activities of daily

24

living that showed he could work in some capacity. (Tr. 93-94b 429-436, 1095, 1106, 1256, 1258).  In addition, Plaintiff had difficulty following the prescribed treatment for his mental impairments even though his symptoms improved with treatment, and his failure to maintain routine mental health treatment are inconsistent with his allegations.  (98, 750, 1106-1107, 1112).

Plaintiff also argues the ALJ erred in rejecting the physical and mental opinions provided by Dr. Webb. (Doc. 11).  With respect to weight given to the opinions of treating physicians, "[a] claimant's treating physician's opinion will generally be given controlling weight, but it must be supported by medically acceptable clinical and diagnostic techniques, and must be consistent with other substantial evidence in the record." Andrews v. Colvin, No. 14-3012, 2015 WL 4032122 at *3 (8th Cir. July 2, 2015) (citing Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014).

The ALJ provided good reasons for giving Dr. Webb's opinions little weight. The ALJ noted that Dr. Webb had only treated Plaintiff one time before rendering his physical and mental assessments a month later. (Tr. 100, 1262).  The ALJ also found Dr. Webb's treatment note failed to reveal the type of significant clinical and laboratory abnormalities one would expect if Plaintiff were as limited as Dr. Webb assessed.  (Tr. 100, 1262). The ALJ ultimately determined Dr. Webb's opinions contrasted sharply with the other evidence in the record, which rendered the opinions less persuasive. (Tr. 100).

Furthermore, Dr. Webb's own forms he used to formulate his opinions asked for objective support, but Dr. Webb failed to cite to objective findings nor did he describe the principal clinical and laboratory findings and symptoms or allegations, including pain, from which the impairment-related capacities and limitations were concluded. (Tr. 1265-1266).  In

addition, Dr. Webb's opinions consisted merely of a checklist form with no elaboration as to how the limitations he assessed were determined. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (holding that a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration").  A RFC assessment provided in this format without cited support in the record amounts to a conclusory opinion. See Johnson v. Astrue, 628 F.3d 991, 994 (8th Cir. 2011).

The ALJ assigned great weight to the opinions provided by the state agency medical consultants because they were consistent with the evidence of record as a whole. (Tr. 99). Although the ALJ did not assign weight to the opinions of Drs. Kahn, Lakamp, Stark, and Saylor in the decision, given the ALJ's specific references to their assessments in his discussion of the opinion evidence, it is highly unlikely that the ALJ did not consider their opinions. (Tr. 99-100); See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

In fact, the ALJ noted that all other examining or treating visual specialists, with the exception of Dr. Kahn's assessment, found Plaintiff was capable of working. (Tr. 99).  The ALJ acknowledged Plaintiff's visual limitations in his RFC determination by establishing the exception he "had to avoid work where excellent depth perception was is required." (Tr. 94). However, the ALJ found Plaintiff retained the visual fields necessary to avoid ordinary hazards in the workplace, and the Court concludes that substantial evidence supports this determination. (Tr. 98).

Based upon the foregoing, the undersigned finds there is substantial evidence to support the ALJ's RFC determination.

**V.      Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 31st day of January, 2018.


/s/   *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE